**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DENISE MINTER <u>et al.</u>          *
                                                    *
            v.                            *  Civil Action WMN-07-3442
                                                    *
WELLS FARGO BANK, N.A. <u>et al.</u>   *


BRADLEY PETRY <u>et al.</u>          *
                                                    *
            v.                            *  Civil Action WMN-08-1642
                                                    *
PROSPERITY MORTGAGE CO. <u>et al.</u>  *


        *    *    *    *    *    *    *    *    *    *    *    *

<u>**MEMORANDUM**</u>

Before the Court is a motion to certify plaintiff classes
in the above-captioned related disputes.  Plaintiffs Denise
Minter, Jason Alborough and Rachel Alborough have moved the
Court on behalf of themselves and other similarly situated
individuals, ECF No. 185 in <u>Minter</u>, while Plaintiffs Bradley and
Stacey Petry seek to represent the interests of a class in their
related dispute, ECF No. 123 in <u>Petry</u>.  After the parties
exhaustively briefed both motions, they are ripe for review.
Upon consideration of the applicable law and facts, the Court
determines: (1) no oral argument is necessary, <u>see</u> Local Rule
105.6; (2) the motion to certify in <u>Minter</u> will be granted in
part and denied in part; and (3) the motion to certify in <u>Petry</u>
will be granted.

Animating both cases is Plaintiffs' theory that Prosperity
Mortgage Company (Prosperity), the product of a joint venture
between Wells Fargo Bank, N.A. (Wells Fargo) and Long & Foster
Real Estate, Inc. (Long & Foster), operated not as an
independent mortgage lender but rather as a mere front
organization formed to circumvent legislation designed to
prevent market-distorting business practices within the real
estate settlement services industry.  Thus, with only minor
exceptions, Plaintiffs' success or failure in both cases will
turn on the independence and legitimacy of Prosperity's
operations.

Prosperity, as it exists today, was formed in 1993 in a
joint venture between Wells Fargo, then known as Norwest
Mortgage, Inc., and Walker Jackson, then known as Prosperity
Mortgage Corporation (PMC).[1]  Walker Jackson is a wholly owned
subsidiary of The Long & Foster Companies and is an affiliate of
Defendant Long & Foster.  In the early 1990s, PMC was struggling
as a mortgage lender.  The Long & Foster Companies, which owned

---

[1] PMC, as it existed prior to 1993, is not to be confused with
Defendant Prosperity.  Despite their identical names, the two
companies are separate corporate entities and are related only
insofar as the latter (Defendant Prosperity) is the product of
the former's (PMC's) 1993 joint venture with Wells Fargo.  For
the sake of simplicity, the Court will refer to all parties by
their current names.  Thus, except where necessary, PMC and
Walker Jackson will be referred to as Long & Foster, while
Norwest Mortgage will be referred to as Wells Fargo.

PMC, sought a larger, more established lender with which to partner to turn PMC into a more profitable venture. Wells Fargo had the expertise of a well-run financial institution and was therefore an attractive partner for PMC. Thus, Wells Fargo and PMC entered into a joint venture in 1993 (Joint Venture), in which the companies agreed to leverage their respective assets and develop Prosperity as a mortgage lender.

Upon consummation of the Joint Venture, Prosperity began operating as a mortgage lender that funded its loans via a wholesale line of credit provided by Wells Fargo, and it continues to operate today as such. The details and motivations of the parties surrounding the Joint Venture, the manner in which Prosperity operated then and now, and the relationship between Prosperity and its parent companies are of significant import to these cases and bear directly on the merits of Plaintiffs' claims.

The Complaint in <u>Minter</u> is predicated on transactions between Prosperity and Denise Minter and Jason and Rachel Alborough (Named Minter Plaintiffs). Denise Minter obtained a mortgage through Prosperity in 2006, while the Alboroughs did the same in 2007. All Named Minter Plaintiffs purchased their homes with the help of a Long & Foster realtor. Later, upon learning that Prosperity may not have been operating in accordance with the law, may have charged them illegal fees, and

may have paid illegal kickbacks, the Named Minter Plaintiffs filed this lawsuit in late 2007. Plaintiffs allege violations of: Sections 8(a), 8(c) and 8(c)(4) of the Real Estate Settlement Procedures Act (RESPA); the Racketeer Influenced and Corrupt Organizations Act; the Maryland Consumer Protection Act, Md. Code Ann. Com. Law §§ 13-101, et seq.; (CPA); and derivative tort claims.

Separately, the Complaint in Petry is predicated on similar allegations. Bradley and Stacy Petry (Named Petry Plaintiffs) purchased a home in 2005 using a Long & Foster realtor with financing through Prosperity. Upon learning of Prosperity's alleged misconduct, they filed suit in 2008. After an earlier motion to dismiss, claims remaining in Petry include: two alleged violations of the Maryland Finder's Fee Act (FFA); a violation of the CPA; and three derivative claims based on unjust enrichment, restitution and civil conspiracy.

II. PROCEDURAL POSTURE

After initial dispositive motions in both cases yielded incomplete results for Defendants, the parties proceeded with discovery. Thereafter, most discovery-related disputes were adjudicated by Magistrate Judge Gauvey, who issued an important memorandum and order on December 16, 2009, ECF No. 156 in Minter (Gauvey Memorandum), bearing directly on two issues pertinent to

4

the instant motion which the parties interpret differently. On
the first issue, Plaintiffs claim Defendants have improperly
cited certain evidence derived from loan files outside the scope
of the discovery limitations imposed by Judge Gauvey. On the
second issue, Defendants argue that Judge Gauvey's decision
regarding the availability of equitable tolling in these cases
was not dispositive and related only to discovery, whereas
Plaintiffs claim Judge Gauvey definitively ruled equitable
tolling would apply in both cases. The Gauvey Memorandum in
dispute provides all the answers the parties seek. Nonetheless,
since the parties have reargued these issues, the Court will
briefly summarize Judge Gauvey's comprehensive treatment of the
disputes.

### A.    The Scope of Discovery

At the outset of discovery, Plaintiffs sought the
production of all loan files generated by Defendants from the
formation of Prosperity in 1993. Owing to the sheer number of
files captured by that request, the parties agreed to limit
production to a random sample of two hundred loan files (200
Loans): one hundred files from the period 1993 to 2003, and one
hundred files covering 2003 to present. This solution enabled
the parties to avoid undue expense yet gain access to data
sufficient to advance their class certification arguments. Both

parties agreed the resulting random sample was representative of all loan files.

Defendants, however, argued in a motion before Judge Gauvey that they should not be limited to relying on the 200 Loans during the class certification phase of litigation, and consequently Defendants sought permission to cite data from all loan files, including those files not provided to Plaintiffs in discovery. <u>See</u> ECF Nos. 111-2 at 8-10 & 156 at 13. To wit, Defendants argued they should be permitted to rely upon

> loan files of borrowers who were not referred to Prosperity Mortgage by Long & Foster, and therefore cannot be in the class, both to show that Prosperity is a <u>bona fide</u> lender that competes in the marketplace and to rebut plaintiffs' claims that customers referred by Long & Foster were charged inflated fees.

Defs.' Opp. Mot. Compel 8, ECF No. 111-2. In response, Judge Gauvey summarily denied Defendants' request and squarely dismissed Defendants' argument, finding that:

> [Defendants'] position is fundamentally unfair, especially in light of defendants' denial of complete access to all loan files to plaintiffs. Given the random nature of the loan file sample selection and its representative character, plaintiffs and defendants should be equally capable of supporting their positions on the basis of that sample. Limitation of precertification discovery of loan files to a limited sample is an excellent, mutually beneficial cost-saving approach. <u>See</u> Manual for Complex Litigation, Fourth § 21.14 (approving of sampling in the context of class-related discovery to the extent it "provides a meaningful, or at least objective, sample of data"). <u>Therefore, plaintiffs and defendants shall be equally limited to only the loan file sample for purposes of class certification</u>.

Gauvey Memorandum 13-14 (emphasis added).

Judge Gauvey could not have been more clear.  And yet, Defendants argue otherwise.  In their memoranda opposing class certification, Defendants cite precisely the type of evidence considered and prohibited by Judge Gauvey—namely, information from loan files of borrowers who were not referred to Prosperity by Long & Foster—prompting Plaintiffs to object.  Defendants defend their citation of such information by arguing the statistics at issue regarding the number of loans issued by Prosperity to customers not originating from Long & Foster were derived not from borrower loan files but from "Defendants' internal reports that track the origins of Prosperity Mortgage's business as well as the amount of Long & Foster transactions that led to Prosperity Mortgage loans."  Surreply 9, ECF No. 248.  In short, Defendants adopt the curious posture that metadata regarding their loan files does not derive from their loan files.  Though Defendants may find Plaintiffs' objections "quite incredibl[e]," ECF No. 248 at 8, it is Defendants' position that lacks credibility.

Moreover, Defendants' attempt to distinguish Judge Gauvey's ruling might be more persuasive if Defendants had not made the same argument to her that they raise here.  Compare Defs.' Opp. Mot. Compel 8-10, ECF No. 111-2, and Defs.' Surreply 8-10, ECF

7

No. 248.  In essence, Defendants argued they should not be

limited to information from the 200 Loans.  Judge Gauvey

rejected that argument, and Defendants did not appeal.

Defendants cannot now argue that Judge Gauvey's ruling was

somehow circumscribed such that it did not apply to precisely

the type of evidence she considered.  Of course, Defendants are

eager to rely on the disputed evidence because it supports their

contention that Prosperity is a bona fide mortgage lender.  As

discussed below, this issue, like so many issues raised by the

parties in their class certification memoranda, relates to the

merits of the dispute and is not properly considered at this

stage of litigation.  In any event, Defendants' citation to

information derived from loan files outside the 200 Loans will

not be considered at this time.

        B.   Equitable Tolling

     In addition to addressing the 200 Loans in the Gauvey

Memorandum, Judge Gauvey opined on the availability of equitable

tolling in these cases.  The issue arose when Defendants

objected to producing loan files generated prior to the time

period defined by the relevant statutes of limitation.

Plaintiffs, however, argued their claims were subject to

equitable tolling and therefore sought documents dating back to

Prosperity's inception in 1993.  To resolve this dispute, Judge

Gauvey engaged in a thorough analysis regarding RESPA and the

FFA statutes of limitation and the potential applicability of equitable tolling to claims brought under those statutes. Judge Gauvey ultimately concluded equitable tolling was indeed available to RESPA and FFA claims and as such ordered Defendants to produce loan files dating to Prosperity's creation.

Plaintiffs, for their part, seem to believe Judge Gauvey's ruling that equitable tolling is available under RESPA and FFA also means the Court need not consider the issue when deciding whether to certify their proposed class definitions.[2] A well-defined class period, of course, is a required component of any class definition. Given its importance, a ruling from a precertification discovery dispute regarding the applicability of equitable tolling under RESPA and FFA is a tenuous foundation upon which to build a case for an expansive class period. That equitable tolling is available under RESPA and FFA does not mean it is applicable to this case.

While Plaintiffs adopt a questionable but defensible view of the Gauvey Memorandum, Defendants have less success. To reiterate, Judge Gauvey, in her own words, held "that equitable tolling is both available and has been adequately pled" in both Minter and Petry. ECF No. 156 at 9. Yet Defendants open their

---

[2] Though Plaintiffs mount a more robust defense of their position regarding equitable tolling in their reply memorandum, they devote exactly one paragraph in their sixty-page opening brief to a discussion of the class period.

discussion of the issue with this: "Plaintiffs' argument that 'Magistrate Judge Gauvey has already held that equitable tolling is available in both Minter and Petry' is patently incorrect." ECF No. 199 at 8. Defendants expound upon this curious position, but the majority of their argument bears on whether the Court should equitably toll Plaintiffs' claims in these cases and not on the issue currently sub judice, to wit, whether the Court should certify the proposed class definitions. Defendants do raise some argument on point, however, and the Court will expound upon the typicality and predominance requirements of Rule 23(a) and (b) below.

To clarify Judge Gauvey's ruling, or rather to reiterate it, equitable tolling is indeed available for claims brought under RESPA and FFA.[3] This means exactly what it says. This does not mean Plaintiffs' claims in these cases have been equitably tolled, it does not indicate a decision on the merits, and it does not end the Court's analysis of the appropriate class period. On the other hand, it does mean Plaintiffs may pursue a theory of the case and a class definition that includes class members whose claims arose outside the applicable statutes

---

[3] To be sure, the availability of equitable tolling was not self-evident, but Judge Gauvey's comprehensive analysis, which relied in part on Judge Blake's earlier and equally effective examination of the issue in Kerby v. Mort. Funding Corp., 992 F. Supp. 787 (D. Md. 1998), definitively answers the question, and the Court need not duplicate the review here.

of limitations.  The effect of equitable tolling on the proposed

class definitions is discussed separately for <u>Minter</u> and <u>Petry</u>

below.


## III. FEDERAL RULE OF CIVIL PROCEDURE 23

The legal standard required to certify a plaintiff class is

set forth in Federal Rule of Civil Procedure 23.  A court may

certify a class only if the proposed class definition satisfies:

(1) all four conditions of Rule 23(a), including numerosity,

commonality, typicality and adequacy;[4] and (2) at least one

condition of Rule 23(b).[5]  The burden of establishing the

---

[4] Fed. R. Civ. P. 23(a) provides:

> One or more members of a class may sue or be sued as
> representative parties on behalf of all only if (1)
> the class is so numerous that joinder of all members
> is impracticable, (2) there are questions of law or
> fact common to the class, (3) the claims or defenses
> of the representative parties are typical of the
> claims or defenses of the class, and (4) the
> representative parties will fairly and adequately
> protect the interests of the class.

[5] To maintain a class action lawsuit, the plaintiff class must
satisfy one of the following three conditions set forth in Fed.
R. Civ. P. 23(b):

> (1) the prosecution of separate actions by or against
> individual members of the class would create a risk of
> (A) inconsistent or varying adjudications with respect
> to individual members of the class which would
> establish incompatible standards of conduct for the
> party opposing the class, or (B) adjudications with
> respect to individual members of the class which would
> as a practical matter be dispositive of the interests

requisite elements lies with the plaintiff (Windham v. Am.
Brands, Inc., 565 F.2d 59, 64 (4th Cir. 1977)), but the Court
has discretion to certify a class and its decision will be
reviewed only for an abuse of that discretion.  Boley v. Brown,
10 F.3d 218, 223 (4th Cir. 1993).

When reviewing a class certification motion, courts may
consider discovery bearing upon the Rule 23(a) and (b)
requirements, Int'l Woodworkers of Am. v. Chesapeake Bay Plywood
Corp., 659 F.2d 1259, 1267 (4th Cir. 1981), but they should
avoid an evaluation of the merits of the underlying claim, Eisen

---

of the other members not parties to the adjudications
or substantially impair or impede their ability to
protect their interests; or

(2) the party opposing the class has acted or refused
to act on grounds generally applicable to the class,
thereby making appropriate final injunctive relief or
corresponding declaratory relief with respect to the
class as a whole; or

(3) the court finds that the questions of law or fact
common to the members of the class predominate over
any questions affecting only individual members, and
that a class action is superior to other available
methods for the fair and efficient adjudication of the
controversy. The matters pertinent to the findings
include: (A) the interest of members of the class in
individually controlling the prosecution or defense of
separate actions; (B) the extent and nature of any
litigation concerning the controversy already
commenced by or against members of the class; (C) the
desirability or undesirability of concentrating the
litigation of the claims in the particular forum; (D)
the difficulties likely to be encountered in the
management of a class action.

v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974) (noting that there is "nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action"). Nevertheless, "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 160 (1982) (internal quotations omitted). "Thus, while an evaluation of the merits to determine the strength of plaintiffs' case is not part of a Rule 23 analysis, the factors spelled out in Rule 23 must be addressed through findings, even if they overlap with issues on the merits." Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004); see also, Fed. R. Civ. P. 23 advisory committee notes to 2003 Amendments (advising that while some merits-related discovery may be necessary prior to class certification, "an evaluation of the probable outcome on the merits is not properly part of the certification decision").

A.   RULE 23(a)

As discussed above, Rule 23(a) delineates four requirements for a certifiable class, the first of which is numerosity. The numerosity requirement is satisfied when the quantity of putative class members is too great to practicably join each as

an individually named plaintiff.  Chisolm v. TranSouth Financial
Corp., 184 F.R.D. 556, 560-61 (E.D. Va. 1999).  As few as forty
class members will generally satisfy this requirement without
further inquiry.  Id.; see also, Lilly v. Harris-Teeter
Supermarket, 720 F.2d 326, 333 (4th Cir. 1983) (holding that 229
class members were "easily enough to demonstrate the existence
of a class" under the numerosity requirement).

The second requirement, commonality, bears upon the
presence of legal or factual questions common among all putative
class members' claims.  To satisfy this prerequisite, class
members' claims must share at least one legal or factual element
susceptible to class-wide proof.  Robinson v. Fountainhead Title
Group Corp., 252 F.R.D. 275, 287 (D. Md. 2008) (Robinson I).
Central to this standard "is not whether common questions of law
or fact predominate, but only whether such questions exist."
Hewlett v. Premier Salons Int'l, Inc., 185 F.R.D. 211, 216 (D.
Md. 2007).  Thus, the commonality requirement is not a high bar,
and individual factual differences will not preclude
certification under this constraint.  Chiang v. Veneman, 385
F.3d 256, 265 (3d Cir. 2004); see also, Peoples v. Wendover
Funding, Inc., 179 F.R.D. 492, 498 (D. Md. 1998) (citing
Zimmerman v. Bell, 800 F.2d 386, 389-90 (4th Cir. 1989)).

Typicality, the third Rule 23(a) requirement, asks whether
the claims of the named plaintiffs—and any defenses to such

14

claims—are typical of the claims and defenses of the putative
class.  The test is "whether the claim or defense arises from
the same course of conduct leading to the class claims, and
whether the same legal theory underlies the claims and
defenses."  Robinson, 252 F.R.D. at 288 (internal quotations
omitted).  Notably, "[f]actual differences will not necessarily
render a claim atypical," provided the named plaintiff's claim
is predicated on the same course of conduct and legal theory as
the claims of the class.  Smith v. The Baltimore & Ohio R.R.
Co., 473 F. Supp. 572, 581 (D. Md. 1979).  Broadly speaking,
typicality and commonality "tend to merge," such that "[b]oth
serve as guideposts for determining whether under the particular
circumstances maintenance of a class action is economical and
whether the named plaintiff's claim and the class claims are so
interrelated that the interests of the class members will be
fairly and adequately protected in their absence."  Falcon, 457
U.S. at 158 n.13.

        The final requirement of Rule 23(a) is adequacy of
representation of the class, and it is closely related to both
commonality and typicality.  Robinson, 252 F.R.D. at 288.  Here,
the Court must ask whether the proposed action will fairly and
adequately protect the interests of the class, whether the
plaintiff's counsel is competent and qualified to manage the
case, and whether the named plaintiff's interests are

antagonistic to those of the putative class.  <u>Amchem Prods, Inc.</u>
<u>v. Windsor</u>, 521 U.S. 591, 625-26 (1997).  Taken together,

commonality, typicality and adequacy demand that "a class

representative . . . be part of the class and possess the same

interest and suffer the same injury as the class members."

<u>Falcon</u>, 457 U.S. at 156.

    B.    RULE 23(b)

    Whereas class certification requires compliance with all

four criteria in Rule 23(a), a putative class needs only to

satisfy one of three criteria in Rule 23(b).  In the instant

cases, Plaintiffs ask the Court to certify the class under Rule

23(b)(3), which permits certification when "questions of law or

fact common to the members of the class predominate over any

questions affecting only individual members, and [when] a class

action is superior to other methods for the fair and efficient

adjudication of the controversy."[6]  Fed. R. Civ. P. 23(b)(3).

Thus, the analysis is two-pronged and requires a showing of both

"predominance" and "superiority."  <u>See</u> <u>Amchem Prods.</u>, 521 U.S.

at 615.

    The animating interest of Rule 23(b)(3) is the "vindication

of the rights of groups of people who individually would be

_____

[6] Plaintiffs also argue the class may be certified under Rule
23(b)(1); however, as Rule 23(b)(3) is the most appropriate
avenue for certification, the Court will confine its analysis to
predominance and superiority.

without effective strength to bring their opponents to court at all." Id. at 617 (internal quotations omitted). Indeed, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry recoveries into something worth someone's (usually an attorney's) labor." Id. (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)). Thus, "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., 521 U.S. at 623. So long as class members' claims are sufficiently cohesive, they may be litigated as a class action.

While both predominance and commonality bear upon the presence of common elements among the class members' claims, predominance under Rule 23(b) is a "far more demanding" standard than the low bar for commonality under Rule 23(a); whereas commonality requires the mere presence of common elements, predominance requires that common elements form the core of the dispute. Id. at 624. Nevertheless, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." Id. at 625. And although the necessity of individualized inquiries may raise

concerns regarding commonality and predominance, the need for individual damage determinations does not destroy the class action. Gunnells v. Healthplan Services, Inc., 348 F.3d 417, 428 (4th Cir. 2003); but see Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 341-42 (4th Cir. 1998) (affirming the district court's denial of certification because "[t]he disparate nature of the claims precludes class treatment"). "In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations." Gunnells, 348 F.3d at 428. Moreover, "[i]n actions for money damages under Rule 23(b)(3), courts usually require individual proof of the amount of damages each member incurred. When such individualized inquiries are necessary, if common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied." Id. (internal citations omitted, emphasis in original); see also, 5 Moore's Federal Practice § 23.23[2] (1997) ("[T]he necessity of making an individualized determination of damages for each class member generally does not defeat commonality."); Ward v. Dixie Nat. Life Ins. Co., 595 F.3d 164, 180 (4th Cir. 2010). Lastly, given that Rule 23 class action certification serves the "important public purposes" of "promoting judicial economy and efficiency" and "afford[ing] aggrieved persons a remedy [when] it is not economically

feasible to obtain relief through the traditional framework of multiple individual actions," "federal courts should give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best service the ends of justice for the affected parties and . . . promote judicial economy."  <u>Gunnells</u>, 348 F.3d at 424 (internal quotations omitted).


IV.  THE PROPOSED CLASS IN MINTER

Plaintiffs in <u>Minter</u> ask the Court to certify the following class:[7]

> All consumers who have at any time obtained a
> federally related mortgage loan originated by
> Prosperity Mortgage Company that was funded by
> transfers from a line of credit at Wells Fargo Bank,
> any of its subsidiaries or any of their predecessors.

This proposed class definition is meant to capture all potential claimants with causes of action alleging: (1) violations of RESPA Sections 8(a), 8(c) and 8(c)(4); (2) violations of RICO; (3) violations of the CPA; and (4) associated common law claims of fraud, civil conspiracy, unjust enrichment and restitution.[8]

---

[7] Plaintiffs set forth this proposed definition in their Reply Memorandum after modifying their original proposal in response to Defendants' objections.  Plaintiffs also suggest variations of this proposed definition in their Reply, which are discussed below in greater detail.

[8] Plaintiffs' claims under the CPA and common law derive from their claims under RESPA and RICO but may be subject to

Notably, the proposed definition is not limited by a class period and is meant to apply regardless of the date on which the potential class members transacted with Prosperity. The sufficiency of the definition under Rule 23 must be analyzed in light of each theory of liability.

A.   Liability Under RESPA Section 8

As a preliminary matter, the nature of liability under RESPA Section 8 and the activity proscribed by the statute must be understood before the Court may expound upon the validity of the proposed class definition. Despite a measure of case law bearing on the topic recently propounded by this Court and others, the parties disagree regarding the scope of RESPA and the means by which a plaintiff may establish a RESPA violation. Specifically, Defendants argue affiliated business relationships, as described below, are not per se illegal even if they do not conform to RESPA's requirements. In contrast, Plaintiffs believe they can impose liability merely by proving Defendants do not qualify for the affiliated business arrangement exemption.

In addition, Defendants raise several issues regarding the constitutionality and application of RESPA and its implementing

---

different statutes of limitations. Nonetheless, as the derivative claims are ancillary to those under RESPA and RICO, they need not be analyzed independently at this time, and neither party has asked the Court to do so.

regulations.  Many of Defendants' arguments do not bear directly on a Rule 23 motion to certify a class action and instead should be or have been raised in a dispositive motion, but the Court will nevertheless clarify the law applicable to this case so as to inform its class certification analysis and provide a measure of certainty moving forward in this litigation.

### 1.   The Legislative History of RESPA

Congress first passed RESPA in 1974 to, inter alia, promote competition within the real estate settlement services industry and to eliminate certain business practices that were artificially inflating the cost of settlement services.  The statute covers a broad swath of real estate-related businesses, but at issue in this dispute is Section 8, which essentially bans settlement service providers from collecting unearned fees. Specifically, the statute proscribes referral fees, kickbacks and certain fee-splitting arrangements, which prior to RESPA's implementation drove up transaction costs charged to real estate purchasers without their knowledge.  Thus, Section 8(a) prohibits certain business referral fees and provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

In addition, Section 8(b) makes illegal the splitting of charges such that:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

Thus, the spectrum of business arrangements and fees covered by subsections (a) and (b) is exceedingly broad. Consequently, the drafters of the statute sought to exempt from RESPA's purview certain payments that were necessary to the settlement service industry or, at minimum, not harmful to competition within it. To wit, Section 8(c), as it was passed in 1974, carved out the payment of fees and salaries for services actually performed and goods actually furnished, as well as payments made pursuant to arrangements between real estate agents and brokers. See Sections 8(c)(1)-(3). These exemptions remain unchanged today and are still in effect.

### 2. Section 8(c)(4) and the ABA Exemption.

As the law was originally enacted, a Section 8 violation was easy to identify where a specific payment was made in return for a specific referral and there was no other reason for the payment. This was the classic kickback. Yet, not long after the law was first enacted in the 1970s, Congress received several inquiries regarding the legality of more sophisticated

transactions where, for example, a there was a less obvious
causal link between the referral and the payment.  These
transactions arose most frequently within the context of
business arrangements where one provider of one settlement
service maintained an enhanced relationship with a second
provider of a different settlement service, through which each
service provider captured the clients of the other.[9]  These
business arrangements were then known as Controlled Business
Arrangements, and in 1983, Congress amended RESPA to define and
permit them under limited circumstances.[10]  Later, Controlled
Business Arrangements were renamed Affiliated Business

---

[9] Perhaps the most puzzling question, among many others, involved
"whether, or under what circumstances, a return on capital
invested [by one service provider in another] which did not vary
in proportion to volume or value of business referred" was
impermissible.  See 47 F.R. 21304, 1982 WL 134962 (May 18,
1982).  In contrast, HUD makes clear, now as it did then, that a
return on capital invested by one service provider in another,
which does vary in proportion to the value of business referred
to the latter, is in fact impermissible.  See 24 C.F.R. § 3500,
App. B, Ex. 7.

[10] Section (3)(7) defines an affiliated business arrangement as
"an arrangement in which (A) a person who is in a position to
refer business incident to or a part of a real estate settlement
service involving a federally related mortgage loan, or an
associate of such person, has either an affiliate relationship
with or a direct or beneficial ownership interest of more than 1
percent in a provider of settlement services; and (B) either of
such persons directly or indirectly refers such business to that
provider or affirmatively influences the selection of that
provider."  12 U.S.C. § 2602(7).

Arrangements (ABAs), but the exemption remained unchanged.[11]

Thus, The ABA carve-out to RESPA's prohibition on kickbacks, added in 1983, appears as Section 8(c)(4), and provides:

> Nothing in [Section 8] shall be construed as prohibiting . . . (4) affiliated business arrangements <u>so long as</u> (A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred . . . , (B) such person is not required to use any particular provider of settlement services, and (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship.

Section 8(c)(4) (emphasis added).

Unfortunately, the addition of the ABA carve-out in 1983 did not end the confusion regarding the scope of RESPA's prohibitions. The uncertainty arose for two reasons. First, the plain language of the statute is somewhat ambiguous. It provides that "[n]othing in [Section 8] shall . . . prohibit[] . . . [ABAs] <u>so long as</u>" the ABAs satisfy three conditions. But what if the ABAs do not satisfy the three conditions? The statute is unclear as to the legality of ABAs not in compliance the Section 8(c)(4), and it is also unclear whether such ABAs

---

[11] The terms "controlled business arrangement" and "affiliated business arrangement" are interchangeable under RESPA and are used herein as such.

may nonetheless avoid liability by virtue of the other exemptions in Section 8(c)(1)-(3).

But the second source of uncertainty was more profound. This is because, by definition, an ABA involves referrals among <u>affiliated</u> settlement service providers as opposed to providers operating at arm's length. When one provider owns another, the former will benefit from the latter's success, even if the latter never pays a direct fee for the former's referrals.[12] For example, if a mortgage broker owns a title company, and if the mortgage broker refers its clients to the title company, the mortgage broker will benefit from those referrals through its ownership interest in the title company, even if the title company never pays a direct kickback to the mortgage broker for the referral.[13] In this example, the mortgage broker has a heightened incentive to ensure the title company captures all the mortgage broker's clients. And this incentive, particularly when it is not disclosed to the client, has the capacity to create the market-distorting effects Congress sought to vanquish

---

[12] Similarly, when referring providers are owned by the same parent company, the parent company will benefit financially even if neither provider pays a direct kickback to the other for a referral.

[13] Provided the mortgage broker's return on its investment in the title company does not vary in proportion to the value of the business the broker refers to the title company, this is the arrangement to which the question in footnote 9, <u>supra</u>, refers.

via REPSA Section 8. See Robinson I, 252 F.R.D. at 286-87

("Congress amended RESPA to exempt [ABAs] from liability only in

certain circumstances because of the concern that the harm

caused by ABAs was not limited to an increase in settlement

costs, but extended to a lack of impartiality in referrals and a

general decrease in competition in the settlement services

market." (internal quotations omitted)); see also Kahrer v.

Ameriquest Mortgage Co., 418 F. Supp. 2d 748, 754-55 (W.D. Pa.

2006); Edwards v. First American Corp., 517 F. Supp. 2d 1199,

1203-04 (C.D. Cal. 2007). Thus, the nature of an ABA is such

that it inherently involves the type of transactions RESPA

sought to proscribe, and this caused confusion. Despite this

apparent inconsistency, Section 8(c)(4) unambiguously exempts

ABAs from Sections 8(a) and (b) if the ABAs satisfy three

requirements. Without further guidance after the 1983

amendment, the question then became: if an ABA—which by its very

nature may involve market-distorting business arrangements—does

not satisfy the three conditions of Section 8(c)(4), is the ABA

a per se violation of RESPA? Or, similarly, does the existence

of an ABA raise the presumption of a Section 8(a) violation,

such that Section 8(c)(4) merely provides a "safe harbor" for

otherwise suspect arrangements?

    Partially in response to this question, the Department of

Housing and Urban Development (HUD) issued in 1992 a final rule

updating various regulations and providing additional guidance

covering the legality of ABAs.[14]  In the final rule, HUD included

a lengthy discussion of the 1983 ABA carve-out, its purpose, and

its scope.  HUD's discussion on this point is particularly

instructive to the instant dispute:

> [The 1983 RESPA amendments] added provisions dealing
> with "controlled business arrangements" (CBAs).  The
> amendments added a definition of "controlled business
> arrangement" . . . and added language at section
> 8(c)(4) of RESPA setting out conditions under which
> CBAs would not violate section 8. . . . Subsection (b)
> of § 3500.15 [of Regulation X] implements section
> 8(c)(4) of RESPA.  The subsection states that a
> controlled business arrangement does not violate
> section 8 of RESPA and § 3500.14 of Regulation X if
> the three elements of the exemption set forth in
> Section 8(c)(4) of RESPA are met.[15]

57 Fed. Reg. 49600, at *49601-02 (internal citations omitted,

emphasis added).  And, indeed, the official HUD regulation

implementing RESPA Section 8(c)(4) provides that "[a]n

affiliated business arrangement is not a violation of section 8

---

[14] The purpose of the 1992 final rule was to update Regulation X.
Regulation X, codified as 24 C.F.R. § 3500, provides regulations
for most provisions of RESPA.  It was first issued in 1976, two
years after RESPA was enacted.  In 1983, RESPA was amended by
the Housing and Urban-Rural Recovery Act to include, inter alia,
the ABA carve-out in Section 8(c)(4).  Regulation X, however,
was not immediately updated to reflect the 1983 statutory
amendments.  Thus, in 1992, HUD issued a new rule updating
Regulation X to reflect the 1983 amendments, and in so doing HUD
clarified and expounded upon the legality of ABAs under Section
8.  57 Fed. Reg. 49600.

[15] Regulation X § 3500.14 implements Sections 8(a) and (b) of
RESPA, the anti-kickback and anti-fee-splitting provisions,
respectively.

of RESPA (12 U.S.C. 2607) and of § 3500.14 <u>if the conditions set forth in this section are satisfied.</u>"  24 C.F.R. § 3500.15(b). The regulation then proceeds to expound upon those necessary conditions.

While neither the statute nor Regulation X explicitly say so, the statements emphasized above strongly imply that ABAs not in compliance with the three conditions of Section 8(c)(4) are per se violations.  This conclusion is further compelled by statutory language elsewhere in RESPA as well as by recorded Congressional intent.  For example, Section 8(d) lists the penalties for various violations of Sections 8(a)-(c). Subsection (d)(3) provides that "[n]o person . . . shall be liable for a violation of the provisions of subsection (c)(4)(A) . . . if . . . such violation was not intentional."  12 U.S.C. § 2607(d)(3).  If a person is not "liable" for a "violation" of Section 8(c)(4) when the violation is accidental, it follows that a person <u>is</u> liable—and therefore subject to the penalties outlined elsewhere in Subsection (d)—for a violation of Section 8(c)(4) when the violation is not accidental.  <u>See</u> <u>Pettrey v. Enterprise Title Agency, Inc.</u>, 241 F.R.D. 268, 275-76 (N.D. Ohio 2006).

In addition to the plain language of Section 8(d), its legislative history provides further evidence for this reading. Discussing a modification of Section 8(d)(2), House Committee

Report No. 98-123 sets forth the Section 8(c)(4) requirements and then provides: "If the persons involved in controlled business arrangements violate the conditions governing such arrangements, they shall be . . . liable." H.R. Rep. No. 98-123, at 75 (1983). Thus, Subsection (d) imposes liability when a party to an ABA fails to comply with the requirements of Section 8(c)(4). In other words, ABAs avoid RESPA liability only if they satisfy the requirements of Section 8(c)(4); otherwise, they violate the statute. See Kahrer, 418 F. Supp. 2d at 755 n.8 ("The prerequisites for permissible controlled business arrangements . . . are set forth in [Section 8(c)(4)]." (emphasis added)).

Finally, the concerns underlying the 1983 ABA carve-out amendment, as provided in a 1982 House Committee Report discussing the issue, provide yet another measure of evidence. The Report noted that the inherent harm of ABAs extends beyond a mere increase in the cost of transaction-specific settlement services. For example:

> [T]he advice of a person making the referral may lose
> its impartiality and may not be based on his
> professional evaluation of the quality of service
> provided if the referror or his associates ha[s] a
> financial interest in the company being recommended.
> In addition, since the real estate industry is
> structured so that settlement service providers do not
> compete for a consumer's business directly, but almost
> exclusively rely on referrals from real estate
> brokers, lenders or their associates for their
> business, the growth of controlled business

> arrangements effectively reduce[s] the kind of healthy
> competition generated by independent settlement
> service providers.

H.R. Rep. No. 97-532, at 52 (1982).

In response to this concern, "Congress exempted controlled business arrangements from liability only in limited circumstances." Edwards v. First American Corp., 610 F.3d 514, 518 (9th Cir. 2010). Thus, the purpose of Section 8(c)(4) was not to ensure that ABAs be allowed to exist or that rogue courts would not improperly extend RESPA to capture ABAs where they otherwise should not. Rather, the purpose was to ensure ABAs would not subvert RESPA's overarching goal of mitigating market-distorting practices. It did this by constraining ABAs and permitting them to operate only within a small space confined by the three conditions designed to reduce the harms ABAs necessarily cause.

Defendants, of course, reject this interpretation. In contrast, they argue that ABAs not in compliance with Section 8(c)(4) are subject to liability only if they violate Section 8(a) or (b). Their argument begins with the assertion that "ABAs are expressly permitted under Section 8(c) of RESPA as entities whose arrangement does not run afoul of Section 8(a) and 8(b)." Minter Opp'n 35, ECF No. 201. This is demonstrably false. Nothing in the statute indicates ABAs do not violate Sections 8(a) and (b). Rather, Section 8(c) provides merely

30

that "[n]othing in [Section 8] shall . . . prohibit[] . . .
[ABAs] so long as" the ABAs satisfy three conditions.  If
anything, this language indicates ABAs do violate RESPA's
prohibitions, hence the need for the "exemption."[16]  Similarly,
Defendants further contend that "nowhere in RESPA is there a
prohibition against ABAs or a provision making ABAs illegal."
ECF No. 201 at 36.  This is only partly true.  Indeed, the
statute does not contain words concisely proscribing ABAs as
such; it does not say "ABAs are illegal."  By statutory
definition, however, ABAs involve by virtue of their affiliation
the transfer of a "thing of value" in exchange, explicitly or
not, for referrals and such transfers are prohibited.[17]

        Aside from their efforts to parse the statute, Defendants
ask the Court to rely upon a rejected HUD regulation that was
never codified or otherwise promulgated to have any legal
effect.  The rejected regulation appears as a HUD "Proposed
rule" from 1988 (Proposed Rule).  The Proposed Rule was issued
after the 1983 RESPA amendment but prior to the 1992 "final

---

[16] Regulation X specifically refers to Section 8(c)(4) as an
"exemption."  24 C.F.R. § 3500.15(b).

[17] To be sure, Regulation X unambiguously contemplates dividends,
retained earnings and other profit distributions as "things of
value" under RESPA.  See 24 C.F.R. § 3500.14(d).

31

rule" and regulation discussed above.[18]  See 57 Fed. Reg. 17424

(May 16, 1988).  The Proposed Rule sought to clarify the scope

of Section 8(c)(4) by refocusing the analysis away from the

presence of affiliated business arrangements and toward the

presence of improper payments.  In short, the proposal would

have ignored the presence of an ABA as a proxy for an illegal

payment, but it would have imposed a presumption of illegality

for certain payments made pursuant to an ABA.  Tellingly, the

proposal defined such payments by "paraphras[ing] . . . the

statutory [ABA] definition with a focus on payment rather than

on the "arrangement."  Id. at 17426.  It was a distinction

without a difference.

　　　In any event, Defendants do not point to the language of

the proposed regulation but rather to HUD's explanatory comments

therein.  The pertinent portions of the commentary begin with a

recitation of the current legislative scheme:

> Nothing in RESPA explicitly states that controlled
> business arrangements are barred by RESPA, but the
> structure of the legislative amendment and the
> accompanying House Report language compels the
> conclusion that Congress regards the existing
> prohibition in Section 8 as a sufficient legal basis

---

[18] Notably, the proposal states: "A purpose of this proposed rule
is to propose [a regulation] in conformity to Section 461 of
HURRA."  57 Fed. Reg. 17424 (May 16, 1988).  As discussed above,
HURRA Section 461 created RESPA Section 8(c)(4).  See supra n.
14.  But this proposal was rejected, and instead HUD adopted the
1992 final rule.  To the extent the 1988 rejected Proposed Rule
is inconsistent with the 1992 final rule, it would be folly to
accept the former in lieu of the latter.

for HUD sanctions against controlled business
arrangements, so that a compensated referral agreement
can be inferred from the mere fact of a controlled
business arrangement and an <u>ordinary dividend
structure</u>.

<u>Id.</u> (emphasis added).  Thus, HUD's view of Section 8(c)(4) and

Congress' intent in creating it mirrors the reading described

above.  Significantly, this was HUD's view not of any regulation

it was proposing but rather of the structure of the law as it

existed in 1988.  Section 8 has not been substantively amended

since then.

Regardless, the Proposed Rule's introductory remarks turn

to various weaknesses and ambiguities of the statute, all of

which are cataloged above.  To address some of these

ambiguities, HUD's introduction continued:

While the existence of a controlled business
arrangement probably must raise the presumption of a
Section 8 violation for the controlled business
arrangement exemption to make sense, it is HUD's view
that there is little legal or factual justification
for viewing a controlled business arrangement which
fails to meet all elements of the new exemption as a
per se Section 8 violation (i.e, legal only if the
elements of the new exemption are satisfied).  Under
that approach, no factual showing by either the
provider of settlement services or incidental business
or the owner of the provider could defeat the
conclusions that . . . a referral agreement exists and
any dividend or similar return on ownership interests
is a payment pursuant to that agreement.  These
conclusions would be enshrined in the regulations no
matter how minor the proportion of referral business,
the actual circumstances leading to the referral, . .
. or other factors.  If Congress wanted this result it
could easily have modified Section 8(a) or otherwise
stated directly that some or all controlled business

33

> arrangements were always illegal without regard to
> Section 8(a).  The RESPA amendments passed in 1983 do
> not compel this reading.

Id.  Predictably, Defendants hang their hat on the last two sentences.  In fairness, if that position were an accurate recitation of the law, it would conflict with the reading of RESPA adopted by this Court and many others.  Alas, it is not.

There are at least three reasons the Court is not persuaded by this position.  The first, quite simply, is that the proposed regulation in which it appears was rejected.  See 57 Fed. Reg. 49600, at *49601.  It is neither statutory law, nor a regulation, nor commentary opining on the scope of a regulation. It is not even a proposed and then rejected regulation, as the position appears in the introduction to a proposal that bears upon presumptively violative payments and not the per se illegality of ABAs.  It is, therefore, of no legal moment and the Court will not rely on it to compel a legal conclusion in conflict with the statutory structure of RESPA, its implementing regulations and its Congressional intent.[19]

---

[19] Defendants cite McCullough v. Howard Hannah Co., 2010 WL 1258112 (N.D. Ohio Mar. 26, 2010) to support their reliance on the Proposed Rule.  The court in McCullough granted a motion to dismiss under Rule 12(b)(6) after finding that "[RESPA] and [the] regulations promulgated thereunder do not create a cause of action for failing to comply with the [Section 8(c)(4)] ABA requirements."  Id. at *3.  The McCullough court relied upon the Proposed Rule for its conclusion.  Id. at *5.  As this Court is not persuaded by the Proposed Rule's authority, it declines to follow McCullough.

Second, in proposing to shift the ABA exemption analysis away from arrangements and toward payments, the proposal ignored the broader goal of mitigating the market-distorting effects of ABAs and their impartiality. As discussed above, the harm of ABAs is not limited to inflating transaction-specific costs; rather, ABAs inhibit healthy competition generated by independent service providers. Thus, Defendants' position is inconsistent with RESPA's Congressional intent. Finally, were the Court to imbue the Proposed Rule with authority, it would also need to consider other proposed and then rejected HUD policy statements and regulations, some of which conflict with the one Defendants cite here. For that matter, the Proposed Rule itself explores imposing a presumption of illegality on certain ABAs, which is in contrast to Defendants' broader position that ABAs are not "somehow inherently improper." Opp'n 36. In short, Defendants' argument fails because the Proposed Rule—and HUD's explanatory comments contained therein—died without ever having been embossed with the imprimatur of authority and, furthermore, the proposal's premise was in direct conflict with the broader goals of RESPA.

In any case, HUD made exceedingly clear in 1992 that affiliated business arrangements, defined by RESPA as certain arrangements among "provider[s] of settlement services," were permissible so long as they conformed to the three conditions

set forth in Section 8(c)(4). For the moment, at least, some of the industry's confusion over Section 8(c)(4) was clarified.

### 3.  Sham ABAs and the HUD Ten Factor Test

Shortly after confirming in 1992 that ABAs in compliance with Section 8(c)(4)'s three conditions did not violate RESPA, HUD began receiving new complaints. This time, the questions involved sham ABAs often disguised as joint ventures formed by some settlement service providers as a means to circumvent RESPA's kickback ban. To be sure, not all such joint ventures between settlement service providers were illegitimate, but some apparently were. In 1996, HUD issued a Statement of Policy (Policy Statement) and defined so-called sham ABAs this way:

> Regardless of the [corporate] form, the common feature of these arrangements is that at least two parties are involved in their creation: a referrer of settlement service business (such as a real estate broker or real estate agent) and a recipient of referrals of business (such as a mortgage broker, mortgage banker, title agent or title company). At least one, if not both, of these parties will have an ownership, partnership or participant's interest in the arrangement. . . . [T]he new entity performs little, if any, real settlement services or is merely a subterfuge for passing referral fees back to the referring party.

61 Fed. Reg. 29258, at *29259 (June 7, 1996). HUD further described sham ABAs by way of the following example:

> Under [one iteration of a sham ABA], a lender and a real estate broker jointly fund a new subsidiary that purports to be a mortgage broker but has no staff and minimal funding, does no work (out sources all process to the lender), receives all business by referral from the broker parent, sells all production to the lender

36

> parent, and pays profits to both parents in the form
> of dividends. . . . [S]uch arrangements . . . afford
> compensation to brokers but impose on them no work or
> business risk.  In short, they are disguised referral
> fee arrangements.[20]

Id.  Thus, settlement service providers had found a new way to

secure referral fees while maintaining a façade of legality.

To address this problem, HUD's Policy Statement opined on

the distinction between permissible ABAs and impermissible sham-

controlled entities.  By statutory definition, ABAs involve

"provider[s] of settlement services," whereas sham-controlled

entities provide no real services at all.[21]  Thus, the Policy

Statement sets forth an analytical framework of ten factors HUD

considers to distinguish between the two and establish whether

an ABA is a "bona fide provider of settlement services."  No

single factor is determinative in HUD's analysis; rather, the

factors are weighed in light of specific facts to determine

whether a specific entity is a sham.  The factors are:

> (1)  Does the new entity have sufficient initial
>      capital and net worth, typical in the industry,

---

[20] Coincidentally, this is strikingly similar to the arrangement
alleged by Plaintiffs.  They claim Wells Fargo, a mortgage
lender, and Long & Foster, a real estate broker, formed
Prosperity, a sham mortgage lender, through which to funnel
referral fees.  Plaintiffs further allege Prosperity outsources
nearly all its functions to Wells Fargo and Long & Foster.

[21] Sham-controlled entities are sometimes referred to as "sham
ABAs."  This is somewhat misleading, because a sham-controlled
entity by definition does not provide settlement services and is
therefore not an ABA at all.  For the sake of convenience,
however, the Court will adhere to this nomenclature.

to conduct the settlement service business for which it was created?  Or is it undercapitalized to do the work it purports to decide?

(2)  Is the new entity staffed with its own employees to perform the services it provides?  Or does the new entity have "loaned" employees of one of the parent providers?

(3)  Does the new entity manage its own business affairs?  Or is an entity that helped create the new entity running the new entity for the parent provider making the referrals?

(4)  Does the new entity have an office for business which is separate from one of the parent providers?  If the new entity is located at the same business address as one of the parent providers, does the new entity pay a general market value rent for the facilities actually furnished?

(5)  Is the new entity providing substantial services, i.e., the essential functions of the real estate settlement service, for which the entity receives a fee?  Does it incur the risks and receive the rewards of any comparable enterprise operating in the market place?

(6)  Does the new entity perform all of the substantial services itself?  Or does it contract out part of the work?  If so, how much of the work is contracted out?

(7)  If the new entity contracts out some of its essential functions, does it contract services from an independent third party?  Or are the services contracted from a parent, affiliated provider or an entity that helped create the controlled entity?  If the new entity contracts out work to a parent, affiliated provider or an entity that helped create it, does the new entity provide any functions that are of value to the settlement process?

(8)  If the new entity contracts out work to another party, is the party performing any contracted

services receiving a payment for services or facilities provided that bears a reasonable relationship to the value of the services or goods received? Or is the contractor providing services or goods at a charge such that the new entity is receiving a "thing of value" for referring settlement service business to the party performing the service?

(9) Is the new entity actively competing in the market place for business? Does the new entity receive or attempt to obtain business from settlement service providers other than one of the settlement services providers that created the new entity?

(10) Is the new entity sending business exclusively to one of the settlement service providers that created it (such as the title application for a title policy to a title insurance underwriter or a loan package to a lender)? Or does the new entity send business to a number of entities, which may include one of the providers that created it?

61 Fed. Reg. 29258, at *29262.

This, therefore, is the HUD 10 Factor Test (Guidelines or Test). If, upon consideration of all applicable factors, the entity under review is not a bona fide provider of settlement services, then the arrangement does not meet the definition of an ABA. And if it does not qualify as an ABA, then it cannot qualify for the ABA exemption, even if it otherwise conforms to the conditions set forth in Section 8(c)(4). Thus, to pass muster under RESPA, an alleged ABA must: (1) involve a bona fide provider of settlement services; and (2) conform to all three conditions set forth in Section 8(c)(4).

Defendants, however, contend that even when a party to an arrangement fails the HUD Ten Factor Test, RESPA liability does not attach unless the arrangement falls within the purview of Sections 8(a) and (b).  This argument is similar to that Defendants advance with respect to the legality of legitimate ABAs under Section 8(c)(4), and it too fails for similar reasons.  Once again, we turn to HUD's guidance.  Specifically, HUD's commentary regarding conditions potentially giving rise to enforcement actions is helpful.  HUD provides:

> [I]n RESPA enforcement cases involving a controlled business arrangement created by two existing settlement service providers, HUD considers whether the entity receiving referrals of business (regardless of legal structure) is a bona fide provider of settlement services.  When assessing whether such an entity is a bona fide provider of settlement services or is merely a sham arrangement used as a conduit for referral fee payments, <u>HUD balances a number of factors [from the HUD Ten Factor Test] in determining whether a violation exists</u> and whether an enforcement action under Section 8 is appropriate.

61 Fed. Reg. 29258, at *29262 (emphasis added).  Thus, the clear implication is that if an entity fails the HUD Ten Factor Test, the arrangement to which it is a party is a violation of RESPA.

Defendants' objections to the HUD Ten Factor Test do not end with their disagreement regarding the consequences of a test failure.  In addition, Defendants claim that the Test should not be afforded any deference by the trial courts and that it is unconstitutionally vague.  Lastly, Defendants submit that

nothing within REPSA or Regulation X permits a private cause of action to enforce the Guidelines.  The Court will discuss each of these remaining arguments in turn.

### 4. Chevron Deference

Under the Chevron doctrine, courts will defer to the implementing agency's interpretation of any statute that lacks clear Congressional intent.  Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984).  In the absence of clear Congressional intent, to which both courts and administrative agencies must always defer, courts will apply an administrative interpretation of the statute so long as the agency's answer to the precise question at issue is permissible. Id. at 843.  Regulations are permissible when they are reasonable and not procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. Russell v. North Broward Hosp., 346 F.3d 1335, 1344-45 (11th Cir. 2003).

As set forth and addressed above, the plain language of RESPA includes several ambiguities.  For example, the definition of an ABA refers to a "provider of settlement services," but it provides no further guidance as to the nature of such providers. Moreover, Section 8(c)(4) is somewhat unclear to the extent that it provides an exemption for ABAs "so long as" they conform to

three conditions.  What of an ABA that does not conform to those conditions?

Of course, neither of these issues escaped HUD.  Indeed, HUD's 1992 final rule and amendments to Regulation X addressed the latter ambiguity, while the 1996 policy statement opined upon the former.  Thus, the Congressional intent underpinning RESPA's referral fee ban with respect to ABAs is not facially evident from the statute's language, and HUD has provided one interpretation of the statute.  Nothing in Regulation X or HUD's guidance thereto is inconsistent with the plain language of the statute, because the regulations and guidance merely expound upon the statute's definition of an affiliated business arrangement, coloring in the statute's outline of the term where Congress left it blank.  In short, HUD's definitional refinement adds to RESPA's language and does not conflict with it.  Accordingly, HUD's regulations and official policy statements qualify for Chevron deference, and the Court will rely upon them where necessary.

### 5.   The Ten Factor Test: Void for Vagueness

Next, Defendants argue the Ten Factor Test is unconstitutionally vague.  The Test would be inapplicable if it were so vague and ambiguous that it deprived Defendants of their right to due process as set forth in the Fifth Amendment.  See United States v. Sun, 278 F.3d 302, 308 (4th Cir. 2002).  The

animating premise of the void-for-vagueness doctrine is one of fair notice.  See Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340 (1952).  Laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."  Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972)).  In addition, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them."  Id.

As a practical matter, however, "few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions."  Boyce Motor Lines, Inc., 342 U.S. at 330-31.  Consequently, "the degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."  Village of Hoffman Estates, 455 U.S. at 498. Courts will tolerate greater degrees of ambiguity when the "consequences of imprecision are qualitatively less severe[,]" for example, in cases that do not implicate First Amendment rights or criminal sanctions.  Id. at 499.

Thus, criminal statutes must be more definite, civil statutes less so. See Sun, 278 F.3d at 309. Where, as here, a statute regulates economic activity but imposes criminal liability,[22] the statute "is subject to a less strict vagueness test" than criminal statutes proscribing other behavior because the statute's "subject matter is more often narrow and because businesses can be expected to consult relevant legislation in advance of action." Id. (quoting United States v. Doremus, 888 F.2d 630, 634 (9th Cir. 1989)). "Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." Village of Hoffman Estates, 455 U.S. at 498. Therefore, hybrid civil/criminal regulations governing economic activity "will be found to satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have a fair warning of what the regulations require." Freeman United Coal Mining Co. v. Federal Mine Safety and Health Review Commission, 108 F.3d 358, 362 (D.C. Cir. 1997) (reviewing the decision of an administrative law judge who imposed civil

---

[22] RESPA regulates economic activity, yet a violation of its anti-kickback and referral fee provisions may result in criminal sanction. Section 8(d)(1) provides, "Any person or persons who violate the prohibitions of this section shall be fined not more than $10,000 or imprisoned for not more than one year, or both."

penalties for violations of the Mine Act, 30 U.S.C. § 820(a),
which also provides for criminal penalties in some cases).

Under the intermediate standard required of hybrid statutes
covering economic activity, the Court finds nothing overly vague
or ambiguous about the plain language of the Test.  As HUD
explains, the ten factors are to be considered in their totality
and balanced appropriately in light of the specific facts of the
business arrangement under review.  Such balancing or totality
of the circumstances tests are common at law and allow the
Court, fact-finder, or a corporation's counsel to weigh certain
factors more heavily than others where appropriate.  This
flexibility moots some of Defendants' arguments.  For example,
Defendants complain that Prosperity's initial capitalization in
1993—as discussed in Factor 1 of the Test—is largely irrelevant
to its operations in 2007.  If Defendants were correct, then the
Court would discount Factor 1 where appropriate.  The same is
true of other factors which may or may not be probative given
the facts at hand.  Moreover, the Test sets forth ten factors,
so even where the Court's analysis of one factor leads to a
vague conclusion, the Test provides nine other probative
factors.  The Test therefore supplies ample guidance to any
businesses possibly subject to RESPA's reach.

Defendants, however, cite Carter v. Welles-Bowen Realty,
Inc., 719 F. Supp. 2d 846 (N.D. Ohio 2010), in support of their

vagueness claim.  <u>Carter</u>, which Defendants suggest may be the
only court "to attempt to apply the HUD Guidelines substantively
to a concrete course of conduct," Minter Opp'n 49, reviewed the
Test and found it too vague to apply in that case.  The <u>Carter</u>
court was specifically concerned with pliable terms including
"sufficient" operating capital (Factor 1), "substantial"
services (Factors 5 and 6), "reasonable" rates for contracted
services (Factor 8), and "active[] competition" within the
marketplace (Factor 9).  <u>Carter</u>, 719 F. Supp. 2d at 853.  That
court was also concerned that the Test required subjective
balancing and that HUD did not explicitly indicate "how many
factors might be determinative."  <u>Id.</u>  Consequently, the <u>Carter</u>
court found the Test "murky," "fuzzy at best," and therefore
unconstitutionally vague.  <u>Id.</u> at 853-54.

    This Court does not share the <u>Carter</u> court's hesitation and
will not follow it.  As discussed above, under the intermediate
vagueness standard applied to statutes like RESPA, the Court
finds nothing so facially ambiguous to create concern.  True, it
may not be immediately clear to a layperson how much operating
capital is "sufficient" for a mortgage lender, but the statute
need only be clear enough for a person "familiar with the
conditions the regulations are meant to address and the
objectives the regulations are meant to achieve."  <u>Freeman</u>
<u>United</u>, 108 F.3d at 362.  Certainly, seasoned real estate

lending executives and their counsel can make a reasonably informed evaluation of a lender's capital requirements. The same is true for "reasonable" rates for contracted services. A layperson may not have any idea how much it costs for a lender to outsource underwriting procedures for low-risk applicants, but industry executives who frequently engage in such transactions should have no trouble discerning whether a specific contract is unreasonably below the prevailing market rate. Thus, while such terms may be "murky" to those not engaged in the real estate industry, they are more than sufficient to provide fair notice to anyone who may require the Test's guidance.

### 6.   Private Enforcement of RESPA

Defendants' final attack on Plaintiffs' overarching theory of the case argues private enforcement of the HUD Ten Factor Test "is questionable" because the Guidelines do not explicitly discuss private actions. While it is true the Guidelines refer only to HUD enforcement actions, the Ten Factor Test is set forth in a HUD policy statement. The policy statement is meant to clarify Regulation X and RESPA, and RESPA explicitly creates a private cause of action. Plaintiffs therefore have standing to pursue their theory of liability under Section 8, which necessarily implicates HUD's guidance and regulations to which the Court will defer. See Edwards, 610 F.3d at 518; Carter v.

<u>Welles-Bowen Realty, Inc.</u>, 553 F.3d 979, 989 (6th Cir. 2009);

<u>Alston v. Countrywide Financial Corp.</u>, 585 F.3d 753, 755 (3rd

Cir. 2009).

<u>7.    RESPA Liability in Minter</u>

Where, then, does that leave Plaintiffs' theories of

liability?  More or less, right back where we began; Plaintiffs'

reading of RESPA is sound.  To pass muster under RESPA Section

8, Defendants' affiliated business arrangement must both (1)

involve a "bona fide provider of settlement services" and (2)

conform to the three conditions set forth in Section 8(c)(4).

In the alternative, Plaintiffs may succeed if they prove

Defendants paid kickbacks for referrals in violation of Section

8(a), but Plaintiffs need not prove a Section 8(a) violation to

succeed on their 8(c) claims.  Thus, Plaintiffs set forth the

following three theories of liability, all of which are legally

sound:

> (1)  Prosperity is a sham-controlled entity under the
>      HUD Ten Factor Test in violation of RESPA Section
>      8(c); or

> (2)  Defendants, as members of an ABA, did not comply
>      with each of the three conditions set forth in
>      Section 8(c)(4), for example by failing to
>      provide borrowers with valid ABA disclosures in
>      violation of Section 8(c)(4)(A); or

> (3)  Wells Fargo paid—and Long & Foster received—
>      kickbacks for settlement services in violation of
>      Section 8(a).

See Reply 6.  Of note, however, is the final theory.  This theory, unlike the others, may only be lodged on behalf of borrowers who used Long & Foster as their real estate broker. The first two theories require no such limitation because they indict Prosperity as such and, therefore, any borrower—not just those borrowers referred by Long & Foster—who transacted with Prosperity has a claim.

    B.   Liability Under RICO

    As with RESPA, the parties disagree over the means by which Plaintiffs may establish a RICO violation in a class action. Defendants claim Plaintiffs must prove proximate causation via reliance, which requires individualized inquiries into each class member.  In contrast, Plaintiffs argue they may invoke an inference of reliance to circumvent the need for individualized determinations.  This Court addressed precisely this issue under very similar circumstances in Robinson v. Fountainhead Title Group, Inc., 257 F.R.D. 92 (D. Md. 2009) (Robinson II), and held that Plaintiffs may indeed rely upon the inference.

    To prevail on a RICO claim, "a plaintiff must establish that 'the defendant's violation not only was the 'but for' cause of his injury, but was the proximate cause as well.'"  Id. (quoting Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 654 (2008)).  A plaintiff may establish proximate causation by proving first-party reliance, but proof of this reliance

typically requires individualized inquiries into the conduct and
knowledge of each class member to determine whether the class
member actually relied upon the alleged wrongful conduct.
Defendants argue this requirement renders Plaintiffs' claims
unfit for class-wide treatment.

Nevertheless, many courts have certified RICO class actions
despite similar reliance arguments.  See, e.g., Robinson II, 257
F.R.D. at 95; Chisolm v. TranSouth Financial Corp., 184 F.R.D.
556, 562-63 (E.D. Va. 1999); Mitchell-Tracey v. United General,
237 F.R.D. 551, 559 (D. Md. 2006).  These courts do so by
permitting the plaintiffs to demonstrate reliance by class-wide
evidence.  "[W]hile each plaintiff must prove reliance, he or
she may do so through common evidence (that is, through
legitimate inferences based on the nature of the alleged
misrepresentations.)"  Klay v. Humana, Inc., 382 F.3d 1241, 1259
(11th Cir. 2004).  Broadly speaking, the common inference
involved in most such cases, as well as in the case at bar, is
that members of the plaintiff class relied upon the purported
legitimacy of the defendant with which they transacted.  See
Robinson II, 257 F.R.D. at 95 ("[I]t would be a reasonable
inference to assume that a class member who purchased services
from [a defendant] relied on the legitimacy of that organization
in paying the rate charged."); Klay, 382 F.3d at 1259 ("It does
not strain credulity to conclude that each plaintiff, in

entering into contracts with the defendants, relied upon the defendants' representations [of legitimacy] and assumed they would be paid the amount they were due."); Chisolm, 194 F.R.D. at 561 ("[Plaintiffs] clearly made payments in reliance upon the assurance that [the defendants acted] in conformity with the law. . . . To conclude otherwise would deny human nature, run counter to the traditional presumption in favor of actors operating under rational economic choice, and leave the Court with an absurd conclusion."). In this case, Plaintiffs may establish reliance via the inference that class members engaged Prosperity's services because they relied upon Prosperity's façade of legitimacy. Put differently, it is reasonable to infer that plaintiff class members would not have transacted with Prosperity had they known Prosperity was not a legitimate lender, especially given that the class members were using Prosperity to secure mortgages and agree to very substantial personal liabilities.[23]

Accordingly, Plaintiffs may pursue their theory of RICO liability by invoking an inference of reliance and need not engage in individualized determinations of each class member's claims. In addition to Defendants' argument regarding the

_____

[23] Whether Prosperity was a legitimate lender, of course, is the central question in this case. If in fact Prosperity was an independent lender, then Plaintiffs' claims fail before they reach the question of reliance.

reliance inference, they also submit that RICO claims are
inappropriate for class-wide treatment because common questions
do not predominate over individualized issues relating to
injuries and damages.  These arguments will be addressed in the
Court's Rule 23(b) analysis below.

C.    Sufficiency of the Proposed Class Definition

This Court has previously certified classes in two cases
premised upon very similar theories of liability.  See Robinson
I, 252 F.R.D. at 275 (RESPA); Benway v. Resource Real Estate
Services, LLC, 239 F.R.D. 419 (D. Md. 2006) (REPSA); Robinson
II, 257 F.R.D. at 92 (RICO).  Defendants, however, rightly note
the facts of this case vary significantly from those in Robinson
and Benway.  While many of the factual distinctions bear upon
the merits of the dispute as opposed to class certification,
some operate to change the Court's Rule 23(a) analysis.
Nevertheless, the overarching theory of Minter is very similar
to that in Robinson I, Robinson II and Benway, and the Court
will rely upon those earlier decisions to a significant degree.
Despite the precedent, however, the sweeping scope of the class
Plaintiffs seek to certify in this case causes a primary area of
concern.

Specifically, Plaintiffs ask the Court to certify a class
capturing all borrowers who ever transacted with Prosperity
dating from Prosperity's inception in 1993.  This now-eighteen-

year class period is problematic for two reasons.  First, the claims of the majority of the proposed class arose well outside the one-year statute of limitations contained within RESPA.  As such, their claims must be equitably tolled if they are to recover for any alleged wrongdoing.  The doctrine of equitable tolling is, of course, available to those individuals, but for it to apply they must prove the requisite elements. Necessarily, this raises potentially dispositive differences between class members whose claims arose within the statute of limitations and those whose claims arose outside of it.

Second, Prosperity's business operations appear to have changed over the last eighteen years.  When Wells Fargo and Long & Foster first founded their joint venture, Prosperity had nearly no capital of its own.  The stated mission of Prosperity in 1993 was to "conduct a residential mortgage lending business principally with customers of Long & Foster Real Estate, Inc." Pls.' Mot. 10-11, ECF No. 186 (citing the Joint Venture Agreement signed by Prosperity's founding parent companies). Indeed, Prosperity's earlier operations focused primarily upon "capturing" Long & Foster customers.  Id.  Moreover, Prosperity outsourced most of its functions to Wells Fargo and Long & Foster, including much or all of its underwriting services, human resources management,* and other business activities.

Prosperity also allegedly lacked its own independent management structure.

As Prosperity matured, however, at least some of its operations changed.  Many of these changes appear to have begun in 2006 or 2007.  For example, Prosperity allegedly widened its focus to include clients not only of Long & Foster but also of other real estate brokers.  And in 2007, Randal Krout assumed the role of President at Prosperity and purportedly implemented several changes.  He was also allegedly endowed with an increased measure of independence from his overseers at Wells Fargo and Long & Foster.

To be sure, the mere fact that Prosperity's operations changed does not necessarily mean Prosperity's status as a legitimate ABA or sham-controlled entity also changed.  Rather, it means merely that the facts relevant to the HUD Ten Factor Test differ somewhat as applied to Prosperity in 1993 and, say, Prosperity in 2008.  Thus, though the facts may differ, the outcome may be the same.  Indeed, several potentially troubling circumstances were present for the entire lifespan of Prosperity.  For one, Wells Fargo internally refers to Prosperity as its "Region 91"—and not as an independent mortgage lender—and to Prosperity's president as "Regional Sales Manager."  Though Wells Fargo's view of Prosperity is hardly dispositive, it is not without probative weight.  Most

significantly, however, is the manner in which Prosperity either "table funds" its loans—if Plaintiffs are to be believed—or sells its loans on the secondary market—if Defendants are to be believed.  In fact, whether Prosperity operates as a sufficiently independent correspondent lender or merely as a dependant "front" for Wells Fargo may be the single most persuasive factor in this litigation.  As to that question, the means by which Prosperity transfers money from its warehouse line of credit at Wells Fargo and then sells the vast majority of its loans back to Wells Fargo do not appear to have changed significantly at all throughout Prosperity's lifespan.

Nevertheless, the factual differences in Prosperity's operations and the need of some potential plaintiffs to prove elements required for equitable tolling raise questions regarding the typicality of the Named Minter Plaintiffs' causes of action.  Conveniently, however, many of the marked changes in Prosperity's operations appear to have occurred near the statute of limitations cut-off date in 2006.  To enable a more accurate analysis, the Court therefore will bifurcate Plaintiffs' proposed class definition to create two classes, one containing only those class members whose claims fall within the statute of limitations (Timely Class), and one for those whose claims fall

outside of it (Tolling Class).[24]  The Court will analyze the
bifurcated class definitions accordingly.

### 1.   Numerosity

Both classes easily satisfy the numerosity requirement.
Prosperity originates more than 10,000 residential mortgage
loans a year, and all or almost all of these borrowers fall
within the putative class definitions.  See Pls.' Mot. 43.  The
Timely Class includes those with claims dating from 2006 to
present, and the Tolling Class includes those from 1993 to 2006.
Accordingly, both Classes have several thousand class members.

### 2.   Typicality and Adequacy

Typicality and adequacy ask whether "the claims and
defenses of the representative parties are typical of the claims
or defenses of the class" and whether "the representative
part[ies] will fairly and adequately protect the interests of
the class."  Robinson I, 252 F.R.D. at 287.  The typicality of
the Named Minter Plaintiffs' claims as they relate to those of
the broader class must be analyzed within the context of the
specific claims advanced; whether the class representatives'
claims are sufficiently typical and adequate turns on which
theory of liability Plaintiffs pursue.

---

[24] To be clear, the changes in Prosperity's operations over time
are, without more, likely insufficient to justify splitting the
class.  But together with the burden imposed by the application
of equitable tolling, this litigation will proceed more
efficiently with two separate classes.

Here, the Named Minter Plaintiffs' claim that Prosperity is an illegitimate sham-controlled entity under the HUD Ten Factor Test is both typical of such claims among the Timely Class and adequate to protect the Timely Class' interests. The gravamen of the sham-ABA claim is that Prosperity is per se illegal under RESPA because it is not a bona fide provider of settlement services. As the focus of that claim is confined exclusively to the nature of Prosperity, all borrowers who used Prosperity will have the same claim and will have to overcome the same defenses. Thus, as goes the sham-ABA allegation of the Named Minter Plaintiffs, so goes the sham-ABA allegation of the entire Timely Class. Accordingly, the Named Minter Plaintiffs satisfy the typicality requirement of Rule 23(a). Moreover, they also satisfy the adequacy requirement because they will zealously litigate the case on behalf of the class, their counsel is competent and have proved as much via several other similar lawsuits, and their interests are directly in line with—and not antagonistic toward—those of the putative class.

The same is true of the Named Minter Plaintiffs' claim that the affiliated business arrangement at the core of this dispute failed to issue ABA disclosure forms in conformity with Section 8(c)(4)(A). Defendants do not dispute that, prior to the commencement of this litigation, Prosperity did not disclose its alleged ABA relationship with Wells Fargo, and Plaintiffs

therefore argue Prosperity uniformly violated Section 8(c)(4)(A) in every transaction.[25]  In this way, Plaintiffs' theory eviscerates the need to perform individualized disclosure investigations.  Because the Named Minter Plaintiffs transacted with Prosperity in the same manner as the putative Timely Class, their claims are typical and adequate.

Typicality relating to Plaintiffs' final theory under RESPA, however, is a different question.  This theory is premised exclusively on Section 8(a), which requires that a kickback be paid in exchange for an actual referral. Necessarily, therefore, only those Prosperity clients who were referred there by Long & Foster may proceed under this claim. Plaintiffs openly acknowledge that, were the Court to certify a class for their Section 8(a) claim, the class definition would need to exclude Prosperity clients who did not use Long & Foster.  To that end, Plaintiffs suggest that the Court exercise its discretion to certify a sub-class.

As discussed in more detail below, the Court will exercise a significant measure of its discretion under Rule 23 to redefine a class that is more manageable and efficient.  This is

---

[25] Defendants argue Plaintiffs' disclosure theory is fundamentally flawed because, as Prosperity sold all its loans to Wells Fargo on the secondary market, Prosperity had no obligation to disclose its relationship with Wells Fargo.  This argument fails, however, because whether such loan transfers were bona fide secondary market transactions is fundamentally in dispute.

already an exceedingly complex case premised upon an unwieldy statute and regarding conduct spanning nearly two decades. A sub-class confined to Long & Foster clients may satisfy the typicality requirement, but it would also unnecessarily complicate and obscure the larger question regarding the legitimacy or illegitimacy of Prosperity. Thus, the Court will not certify a sub-class for Plaintiffs' Section 8(a) theory at this time. See Fed. R. Civ. P. 26(c)(4) ("When appropriate, a class may be brought or maintained as a class action with respect to particular issues." (emphasis added)). Should Plaintiffs fail under their Section 8(c) claims, the Court may entertain further briefing with respect to the Section 8(a) theory.

The Named Minter Plaintiffs also fail under typicality with respect to the Tolling Class. First, Tolling Class claims must, as a threshold matter, satisfy certain requirements to be equitably tolled, whereas the claims of the Named Minter Plaintiffs suffer no such burden. Defendants, therefore, are entitled to attack the Tolling Class members' claims as unqualified for equitable tolling, and the Named Minter Plaintiffs' claims are not typical for this purpose. Second, as discussed above, the facts of Prosperity's business operations as they relate to the Tolling Class are somewhat distinct from those as they relate to the Timely Class. This distinction

alone is insufficient to defeat typicality, but when coupled
with the need for a tolling analysis the Court is persuaded the
Named Minter Plaintiffs' claims cannot represent members of the
Tolling Class.  Because the Tolling Class lacks a representative
member with claims sufficiently typical and adequate, the Court
will not certify the Tolling Class as such.  Nonetheless, if
Plaintiffs wish to pursue Tolling Class claims premised on RESPA
Section 8(c) in this litigation, they may identify and designate
a proper class representative and move the Court to that end.[26]

As for the RICO cause of action, there is nothing to
suggest the Named Minter Plaintiffs' claims are anything but
typical and adequate here as well.  All Timely Class members,
including the Named Minter Plaintiffs, transacted with
Prosperity in the same manner and the same theory of RICO
liability is therefore available to all class members.
Consequently, the class representatives' claims are also subject
to the same defenses as those of the class and are therefore
typical and adequate as well.

### 3.   Commonality and Predominance

---

[26] The remainder of the Court's analysis will pertain only to the
Timely Class; however, should Plaintiffs join a Tolling Class
representative with claims similar to those of the Named Minter
Plaintiffs but for their accrual date, the Court's analysis of
such Tolling Class representative would be similar to the
analysis here.

While commonality requires only a showing of one common
issue related to all class members' claims, predominance
requires that such issues predominate over any individualized
legal or factual issues.  The Named Minter Plaintiffs' Section
8(c) claims satisfy both these burdens with respect to the
Timely Class.  The central inquiry under both theories is
focused on the nature of Prosperity.  If, under the sham ABA
claim, Prosperity does not pass muster under the HUD Ten Factor
Test, the Named Minter Plaintiffs will prevail along with all
members of the Timely Class.  The claims of the Timely Class
rise and fall along with those of the Named Minter Plaintiffs
because the HUD Ten Factor Test considers the nature of
Prosperity's business operation as a whole and does not inquire
into transaction-specific details.  Either Prosperity is a sham-
controlled entity, or it is not.  Thus, issues of law and fact
common to all members of the putative Timely Class predominate
with respect to the sham-ABA claim.

Nonetheless, Defendants argue the HUD Ten Factor Test must
be applied to each class member and each transaction.  This
argument misses the point of the Test and RESPA's proscription
of sham-controlled entities.  Under Defendants' theory,
Prosperity could be a sham-controlled entity for one client on
one day, then a legitimate ABA for another client on the next
day.  This is incorrect, and as such Plaintiffs' sham-ABA theory

does not require inquiry into any facts not subject to class-wide proof.

Similarly, Plaintiff's Section 8(c)(4)(A) theory will also rise or fall on a class-wide basis. Whether Prosperity was required to provide certain ABA disclosures will turn on the nature of its business arrangements. As Plaintiffs specifically focus on Prosperity's failure to disclose its relationship with Wells Fargo, the inquiry will focus on the nature of the relationship between the two companies and whether RESPA requires Prosperity to disclose that relationship. This, too, is not something that would have varied transaction by transaction, and consequently Plaintiffs may argue their theory, and Defendants may defend against it, on a class-wide basis.

Plaintiffs' RICO claims present a more difficult question under predominance. Defendants argue Plaintiffs cannot prove actual injury and damages on a class-wide basis because such elements require individualized determinations. Typically, in a standard RICO lawsuit not pursued as a class action, a plaintiff must demonstrate both actual injury and damages, and of course the same is true here. The class action nature of this litigation does not relieve Plaintiffs of their burden to prove all requisite RICO elements. But as with Defendants' objections regarding causation discussed above, the Court has previously addressed this exact same argument in <u>Robinson II</u> and certified

a class nonetheless.[27]  It is well-established that

individualized inquiries into damages and other minor questions

of law do not defeat predominance.  Several courts have reached

this same conclusion, including the Fourth Circuit, and this

Court sees no reason to depart from those prior holdings.  See

Gunnells, 348 F.3d at 429; Central Wesleyan Coll. v. W.R. Grace

& Co., 6 F.3d 177, 185 (4th Cir. 1992); Robinson II, 257 F.R.D.

at 85.

            4.   Superiority

     Defendants argue that because REPSA provides for attorneys'

fees plus damages equal to three times the settlement fees paid

by each plaintiff, class members have sufficient financial

incentive to pursue their claims individually and as such a

class action is not a superior means of adjudicating the class

members' claims.  Based upon the 200 Loans, Defendants claim

total settlement fees charged range from "hundreds to thousands

of dollars."  Opp'n 82.  Even if trebled, this is not an

incentive sufficient to induce Plaintiffs to pursue complex

litigation individually.  In fact, these claims are ideal for

class action litigation under Rule 23(b)(3).  This litigation

---

[27] Defendants contend Robinson II is different from the case at
bar because whereas Robinson II involved the selection of a
title company by a lender, this case involves the selection of a
lender by a borrower.  The Court is not persuaded that this is a
legally operative distinction, regardless of any variance in the
interests of lenders and borrowers.

presents no exceptional obstacles to efficient management, and indeed Plaintiffs' counsel have already litigated at least two similar cases before this Court without issue. Consequently, a Rule 23(b)(3) class action is a superior mode of litigating the Timely Class' claims.

###### 5. Summary

At this stage in the litigation, the Court will certify Plaintiffs' proposed class definition as modified to include only claimants with timely RESPA claims. The class will apply only to Plaintiffs' (1) sham-controlled entity claim; (2) Section 8(c)(4)(A) claim for failure to properly disclose the ABA; (3) RICO claim; and (4) derivative common law claims. Thus, the definition to be certified is:[28]

> All consumers who have obtained a federally related mortgage loan originated by Prosperity Mortgage Company that was funded by transfers from a line of credit at Wells Fargo Bank, any of its subsidiaries or any of their predecessors, on or after December 26, 2006.

The Court will not certify a class for Plaintiffs' claim under Section 8(a) at this time. Moreover, the Court will not certify

---

[28] Redlined, the new class definition is:

> All consumers who have ~~at any time~~ obtained a federally related mortgage loan originated by Prosperity Mortgage Company that was funded by transfers from a line of credit at Wells Fargo Bank, any of its subsidiaries or any of their predecessors, **on or after December 26, 2006.**

a class of claimants whose claims must be equitably tolled to succeed, but should Plaintiffs choose to join an acceptable class representative and seek to certify a class based on that representative's claims, the Court will entertain a motion to that end.

## V.    THE PROPOSED CLASS IN PETRY

In Petry, Plaintiffs ask the Court to certify the following class:[29]

> All persons who entered into a mortgage loan transaction secured by real estate located in Maryland where (1) Prosperity Mortgage (2) is identified as the mortgage lender in the operative documents relating to the transaction, (3) Prosperity Mortgage received a fee for services in the transaction, and (4) the loan was funded through a Wells Fargo line of credit.

Plaintiffs propose this class to capture all potential claimants with claims alleging: (1) violations of the Maryland Finder's Fee Act, Md. Code Ann., Com. Law §§ 12-801, et seq., including Section 12-804(e) (prohibiting finder's fees where someone acts as both a mortgage broker and a lender) and Section 12-805(d) (prohibiting finder's fees by mortgage brokers without a written broker's agreement); (2) violations of the CPA; and (3) associated common law claims of restitution, unjust

---

[29] Plaintiffs provide this proposed definition in their Reply Memorandum after modifying their original proposal in response to arguments raised in Defendants' opposition memorandum.

enrichment and civil conspiracy.[30]  As with Plaintiffs' proposal

in Minter, this class definition contains no period and

therefore applies to all claimants who transacted with

Prosperity at any time dating to Prosperity's inception.

A.    Liability under the Maryland Finder's Fee Act

The primary thrust of Plaintiffs' Finder's Fee Act claims

is that Prosperity acted simultaneously as both a mortgage

broker and as a nominal lender and then collected fees for doing

both.[31]  There are, in theory, several avenues by which a

plaintiff could recover under the FFA, many of which would

require an investigation into the specific role of the alleged

transgressor, the means by which the alleged transgressor funded

the plaintiff's loan, the specific disclosures provided to the

plaintiff, and the specific fees paid by the plaintiff to the

transgressor.  In fact, Defendants argue Plaintiffs' claims in

this case require exactly that—namely, detailed individualized

factual findings for each class member—and are therefore not

suitable for class-wide treatment.

_____

[30] Similar to Minter, Plaintiffs' claims in Petry under the
Maryland Consumer Protection Act and common law derive from
their claims under the FFA.  While the relevant statutes of
limitation for CPA and tort claims differ from that of the FFA,
certification with respect to these derivative claims need not
be addressed independently at this time.

[31] Plaintiffs also allege Prosperity collected finder's fees for
acting as a mortgage broker yet failed to provide a written
broker's agreement with necessary disclosures.

In this case, however, Plaintiffs allege Prosperity by its nature was always a mortgage broker and never the mortgage lender it claimed to be, as evidenced by the means by which Prosperity funded its loans and then resold the loans to Wells Fargo shortly after origination. Put differently, this Court previously described Plaintiffs' theory of the case as follows:

> Plaintiffs allege that Prosperity acted as a mortgage broker in numerous "table funded" transactions which were funded by Wells Fargo and closed in the name of Prosperity. . . . As Defendants point out, the test for determining whether a loan is table-funded or a bona fide secondary market transaction requires the Court to consider the facts: that is, who is the real source of funding and the real interest of the funding lender.

Ct. Mem. Feb. 11, 2009, 9-10, ECF No. 49 (quotations omitted). Thus, like the plaintiffs in Minter, the Petry Plaintiffs seek to prove their case by indicting Prosperity as Prosperity, and not by proving Prosperity failed to conform to the law on a transaction-by-transaction basis.

Bearing directly on this question of Prosperity's role as broker and lender is Prosperity's status as a sham-controlled entity or independent provider of settlement services as defined by RESPA and HUD. This distinction is not dispositive under the FFA—after all, RESPA is a federal statute while the FFA is a creature of state law—but it does inform the FFA analysis. If, as the Minter Plaintiffs allege, Prosperity were merely a sham or "front" company for Wells Fargo, then it would follow that

67

Prosperity, though acting as a lender, was in reality a broker for Wells Fargo under the FFA. Thus, just as the <u>Minter</u> plaintiffs seek to attack Prosperity via class-wide evidence, so too do Plaintiffs in <u>Petry</u>.

But whereas the <u>Minter</u> plaintiffs may prevail by proving Prosperity is per se illegal under RESPA, Plaintiffs in <u>Petry</u> must do more than merely demonstrate that Prosperity is a "front" brokerage for Wells Fargo loans. The FFA proscribes finder's fees in certain circumstances, which is to say a violation of the FFA necessarily requires the imposition of a finder's fee.[32] Unfortunately, however, the scope of fees and charges considered "finder's fees" under the FFA is somewhat ambiguous, and the parties dispute the FFA's reach.

The FFA defines a "finder's fee" as "any compensation or commission directly or indirectly imposed by a broker and paid by or on behalf of the borrower for the broker's services in procuring, arranging, or otherwise assisting a borrower in obtaining a loan or advance of money." Md. Code Ann., Com. Law § 12-801(d). Facially, the definition is broad and would seem to encompass any fees charged to a borrower by a broker in the

---

[32] This is in contrast to RESPA, which proscribes kickbacks in Section 8(a) and, separately, non-compliant and sham ABAs in Section 8(c). Under RESPA, a plaintiff need not demonstrate a kickback because one is inferred from the affiliated business arrangement. The FFA provides no special treatment for ABAs; thus, a plaintiff must actually demonstrate a finder's fee.

course of brokering a loan.  Section 12-804(a), entitled

"Authorized fees," then caps finder's fees at 8% of the amount

of the loan, subject to the exception in Section 12-804(e).[33]

Subsection (b), however, provides: "[i]n addition to a

finder's fee, a mortgage broker may charge a borrower for the

actual cost of . . . [a]ny appraisal [or] credit report" or of

certain other services.  Thus, under certain conditions, the FFA

explicitly permits both finder's fees and fees for specified

other goods and services.  And herein lies the ambiguity.  The

statutory definition of "finder's fees" would seem to encompass

fees for appraisals or credit reports because such fees would be

imposed to "procur[e], arrang[e], or otherwise assist[] a

borrower in obtaining a loan or advance of money."  Yet, the

structure of Sections 12-804(a) and (b) suggests the FFA

contemplates appraisal and credit report fees as something other

than finder's fees.

Plaintiffs argue—or rather assume—that all fees charged by

Prosperity to a borrower are finder's fees under the broad

statutory definition of the term.  Under Plaintiffs' theory,

---

[33] Section 12-804(e), which provides the basis for one of
Plaintiffs' theories of liability, provides: "[a] mortgage
broker may not charge a finder's fee in any transaction in which
. . . an owner . . . of the mortgage broker is the lender."
Here, Plaintiffs allege Prosperity brokered loans to Wells
Fargo, Prosperity's part-owner, and charged finder's fees for
doing so.  Thus, the cap on finder's fees in subsection (a) is
inapposite.

Prosperity would have violated Section 12-804(e) any time it charged any fee to a borrower, even if that fee were for an appraisal or credit report.  This theory precludes the need for individualized determinations of the fees Prosperity charged because all fees would be impermissible.  Defendants, on the other hand, argue that despite the broad statutory definition of "finder's fee," charges for goods and services under Section 12-804(b) are not FFA finder's fees and therefore not impermissible.  Under Defendants' position, Plaintiffs would be required to prove the fees Prosperity charged in each transaction were not confined to permissible charges under subsection (b).  This, Defendants argue, would therefore require individualized determinations.

Despite submitting over one hundred pages of briefs between Minter and Petry, Plaintiffs presented very little on this question.  Defendants treat the issue with more diligence, but both parties appear to assume they are correct without providing much in the way of supporting authority.  At this juncture, the Court need not determine the precise scope of fees proscribed by the FFA.  It is enough to say that the broad statutory definition of "finder's fee" under the FFA captures all fees but for those specifically exempted in Section 12-804(b).  The implications of this conclusion are discussed below in the

Court's analysis of Plaintiffs' proposed class definition under
Rule 23(b) predominance.

B.   Sufficiency of the Proposed Class Definition in Petry

Though Petry is not premised on RESPA, it involves the same
sort of existential questions regarding Prosperity found in
Minter.  By extension, it is also somewhat similar (though by no
means identical) to both Benway and Robinson.  Perhaps more
significantly, at least one Maryland state court has certified a
similar class action alleging violations of the FFA.  See Taylor
v. Savings First Mortgage, LLC, Case No. 24-C-02001635
(currently open in the Circuit Court of Baltimore City).[34]  In
short, there is at least some precedent for class action
treatment of FFA cases.  As always, however, this case must be
analyzed in light of the specific facts and legal theories
presented by the Petry Plaintiffs, some of which differ markedly
from those in Minter.

The most significant difference between Minter and Petry,
of course, is the statute from which the claims derive.  The
FFA, aside from proscribing completely different activity, lacks
RESPA's one-year statute of limitations.  Instead, the FFA
qualifies for Maryland's 12-year statute of limitations for

---

[34] This case was cited and discussed in memoranda filed by both
Plaintiffs and Defendants.  As such, while that court's decision
is unpublished and without binding effect, neither party will be
prejudiced by its citation here.

"specialty" claims.  See Md. Code Ann., Cts. & Jud. Proc. § 5-
102(a)(6); Master Fin., Inc. v. Crowder, 972 A.2d 864 (Md.
2009).  The specialty statute applies where "(1) the duties,
obligations, prohibitions, and rights sought to be enforced by
the plaintiffs are created and imposed solely by [statute], (2)
the remedy pursued . . . is authorized solely by [statute], and
(3) the ascertainment of those amounts is readily
ascertainable."  Crowder, 972 A.2d at 867.

Defendants argue the 12-year specialty statute should not
apply to FFA claims because the FFA fails the Crowder conditions
in that (1) the fees proscribed and recoverable under the FFA
are also recoverable under common law claims of unjust
enrichment and for restitution; and (2) damages for violations
of the FFA are not readily ascertainable.  Defs.' Limitations
Mem. 7, ECF No. 199.  Judge Gauvey, however, already addressed
these arguments in this case:

> The Maryland Finder's Fee Act meets [the Crowder]
> requirements: application of this extended statute of
> limitations is not precluded by plaintiffs' pursuit of
> additional claims, Crowder, 972 A.2d at 868, 872, a
> statutory remedy that is heightened from that
> available at common law is sufficiently statutory to
> justify application of the specialty statute, id. . .
> . at 876, and damages under the Finder's Fee Act are
> certainly readily ascertainable, with the alternative
> liquidated, fixed remedy of $500 per transaction, id.

Gauvey Memorandum 5-6 n.4.  Though Judge Gauvey's analysis
appeared in dicta in a discovery dispute-related memorandum and

72

did not come to this Court under report and recommendation, its legal analysis is correct and will be adopted as such.  <u>Crowder</u> compels this Court's application of the 12-year specialty statute.

Thus, under the 12-year statute of limitations, claims dating from June 1996 forward are timely.  Plaintiffs, however, seek to capture those claimants whose transactions occurred dating to Prosperity's inception in 1993.  As discussed above, equitable tolling is available under the FFA and, should Plaintiffs prove the elements required to equitably toll otherwise untimely claims, Plaintiffs may proceed with an unbounded class.  Whereas in <u>Minter</u> the Court declined to include both timely and untimely claims in one class, <u>Petry</u> does not require any such bifurcation.  The <u>Minter</u> class was split for the sake of efficiency not only to break out the untimely claims but also because doing so simplified the analysis of Prosperity's business operations.  While Plaintiffs' FFA claims also require an investigation into Prosperity's operations, the 12-year statute of limitations in <u>Petry</u> does not provide an easy boundary coinciding with a measurable change in Prosperity's organization or practices.  In the absence of such coincidental convenience, the Court will not exercise its discretion in <u>Petry</u> to redefine Plaintiffs' proposed class.  As such, the Court's

Rule 23 analysis will proceed based upon the proposed class definition provided by Plaintiffs.

### B.   Numerosity

Plaintiffs seek to certify a class spanning the entire life of Prosperity.  Prosperity completes thousands of transactions per year.  To the extent Plaintiffs' proposed class definition captures only a portion of those transactions, it still includes "tens of thousands" of putative class members.  Numerosity, therefore, is satisfied.

### C.   Typicality and Adequacy

The class representatives will satisfy the typicality and adequacy requirements if their claims and defenses are typical of those of the putative class, and if representatives will fairly and adequately protect the interests of the class.  Here, the Named Petry Plaintiffs ostensibly secured a mortgage loan from Prosperity in 2005.  As it always did, Prosperity obtained the funds for the Petrys' loan from its warehouse line of credit with Wells Fargo.  During the transaction, the Petrys paid Prosperity certain fees.  Consequently, the Petrys fall squarely within Plaintiffs' proposed class definition.

Moreover, the Named Petry Plaintiffs' claims are typical of those of the class.  Plaintiffs allege the nature of Prosperity's operations were such that it always acted as both a mortgage broker and a nominal lender and that Prosperity's

operations did not vary in any operative manner from class member to class member. Thus, all that is required of the Named Petry Plaintiffs is that they transacted with Prosperity in the same manner as the other putative class members, and indeed they did.

To the extent the Named Petry Plaintiffs' claims are not subject to the same defenses as those of class members whose claims must be tolled to succeed, this distinction is not sufficient to defeat typicality. The facts on which Plaintiffs will rely in their attempt to satisfy the elements of equitable tolling are not inconsistent with the Named Petry Plaintiffs' claims, and in fact they overlap almost completely.[35] Furthermore, factual variations do not defeat typicality so long as the claims of the class representatives arise from the same conduct and legal theory as those of the putative class members. Here, the claims of class members who must rely upon equitable tolling and those of the Named Petry Plaintiffs are identical in this regard.

Last, the Named Petry Plaintiffs' claims are no in way antagonistic to those of the putative class, Plaintiffs' counsel

---

[35] For example, Plaintiffs allege Prosperity fraudulently concealed facts that form the basis of Plaintiffs' claims in a uniform and consistent manner, and that Plaintiffs' were uniformly and consistently deceived into paying unlawful fees to Prosperity. As a consequence, Plaintiffs allege they could not have been aware of facts that would or should have provoked inquiry. See ECF No. 156 at 9.

is competent and qualified, and the class representatives will fairly and adequately protect the interests of all class members.  As such, the Named Petry Plaintiffs' claims are both typical and adequate under Rule 23(a).

D.    Commonality and Predominance

To reiterate, commonality and predominance ask whether questions of law and fact common to all putative class members predominate over individualized concerns.  And here, too, Plaintiffs' focus on Prosperity's business operations renders unnecessary individualized examinations of each class members' claims, thereby satisfying these two requirements.  If Prosperity did not operate as an independent lender, if Prosperity were merely a broker for Wells Fargo loans despite its outward representations to the contrary, then Plaintiffs will prevail.  As this is the primary, central, dominating question in Petry, any other issues are ancillary.

Defendants, however, argue that any claim predicated on the FFA necessarily involves individualized determinations of fact that are not subject to class-wide proof.  Specifically, Defendants submit this case is inappropriate for class action treatment because: (1) the Court must determine whether Prosperity acted as both a broker and nominal lender in each transaction; (2) the Court must determine whether and to what extent fees charged by Prosperity in each transaction were

impermissible finder's fees under the FFA or merely permissible fees for goods and services as outlined in Section 12-804(b); and (3) calculation of damages under the FFA must also entail individualized analyses because fees charged for services actually rendered are not impermissible.

Defendants' first argument fails for the same reason it failed in <u>Minter</u>. Plaintiffs do not allege Prosperity operated as a broker in some transactions and as a lender in others; rather, Plaintiffs allege Prosperity was inherently a "front" for Wells Fargo, which as applied to <u>Petry</u> means that Prosperity was by its nature always a mortgage broker and never a lender. Thus, under Plaintiffs' theory of liability, the fact-finder need not engage in individualized analyses. Either Prosperity was inherently a broker under the FFA, or Plaintiffs' claims fail.

Defendants' second argument turns on the distinction between impermissible finder's fees and permissible fees for certain services set forth in Section 12-804(b). If Prosperity charged a specific borrower exclusively subsection (b) fees and no others, then that borrower likely would not have a claim under the FFA.[36] To advance their argument, Defendants cite

---

[36] As discussed above, this remains an unresolved question, and the Court declines to announce a definitive conclusion at this time.

several transactions in which Prosperity charged permissible

fees for appraisals and credit reports.[37]  Defendants do not,

however, cite any transactions in which Prosperity's fees were

limited exclusively to permissible charges.  To the contrary,

the evidence before the Court suggests each transaction

generated myriad fees both permissible and impermissible in

nature.  Given the broad scope of fees made impermissible by the

FFA, most if not all transactions with Prosperity will have

involved an FFA violation, provided of course Prosperity was

acting as both broker and nominal lender as Plaintiffs allege.

In this way, common questions of fact predominate over any

individualized analyses of specific loans.[38]

---

[37] Defendants derived this information from the HUD-1 settlement
statements contained within the 200 Loans.  Each borrower's HUD-
1 statement delineates the fees charged to that borrower.  If
for whatever reason it becomes necessary to individually examine
the transactions of specific class members, a simple review of
the HUD-1 statements will reveal whether such specific members
were charged impermissible finder's fees.

[38] To the extent Defendants wish to prove certain transactions
did not involve any impermissible fees, they may of course
present such evidence.  These individualized inquiries will not
defeat class certification, however, because they will be
ancillary and uncommon, and the more central question of
Prosperity's role vis-à-vis Wells Fargo will still predominate.
Moreover, the evidence currently before the Court suggests such
instances are rare and will be exceedingly difficult to prove.
Even where the basis for certain charges in a transaction is
unclear, Plaintiffs need only establish that Prosperity charged
one impermissible finder's fee.  Once the FFA violation is
established, damages calculations are exceedingly simple in that
the FFA provides for fixed liquidated damages.  Thus, Plaintiffs

Defendants' third argument regarding the need for individualized damages assessments fails for a similar reason. Class action lawsuits certified under Rule 23(b)(3) specifically contemplate individualized calculations of damages. Here, the means by which damages are calculated is uniform for each member of the putative class, and the information required for such calculations is easily ascertainable on the basis of charges appearing on each borrower's HUD-1 settlement statement. If there is any ambiguity whether certain charges listed on the HUD-1 statements are impermissible finder's fees or something else, Plaintiffs need not decipher the two. Rather, the FFA provides for liquidated damages of $500 per transaction. As such, the nature of damages under the FFA does not defeat predominance.

E.   Superiority

Plaintiffs claims in <u>Petry</u> are ideal for adjudication as a class action under Rule 23(b)(3). The value of each claim independently is not sufficient to incentivize class members to pursue complex litigation, even when damages under the FFA are trebled. As in <u>Minter</u>, the upper bound of damages available to each claimant reaches only a few hundred or thousands of dollars. Furthermore, litigating these claims as a class action

_____

need not even prove the amount of the impermissible fees but only that one was charged.

promotes judicial economy and the efficient use of the Court's resources, and as Plaintiffs' counsel have already litigated similar class actions, this case should not be exceptionally difficult to manage.

### F.    Summary

The Court will certify Plaintiffs' proposed class definition with respect to all its claims in <u>Petry</u>.  These claims include: (1) violations of Maryland Finder's Fee Act Sections 12-804(e) and 12-805(d); (2) violations of the Maryland Consumer Protection Act, and (3) common law claims for restitution, unjust enrichment and civil conspiracy.  Thus, the Court will certify the following class definition:

> All persons who entered into a mortgage loan transaction secured by real estate located in Maryland where (1) Prosperity Mortgage (2) is identified as the mortgage lender in the operative documents relating to the transaction, (3) Prosperity Mortgage received a fee for services in the transaction, and (4) the loan was funded through a Wells Fargo line of credit.

### VI.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Plaintiffs' motion to certify the class in <u>Minter</u>. Furthermore, the Court will grant Plaintiffs' motion to certify the class in <u>Petry</u>.  The Court will issue a separate Order to that effect.

_____ /s/ _____
William M. Nickerson
Senior United States District Judge

May 3, 2011